IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION


CONSTANCE SPINOZZI, on behalf of a )
others similarly situated,          )
                                    )
            Plaintiff,              )
                                    )   3:08CV229
                                    )   FEBRUARY 5, 2009
       vs                           )
                                    )
LENDINGTREE, LLC; NEWPORT LENDING   )
CORP; SOUTHERN CALIFORNIA           )
MARKETING CORP; HOME LOAN           )
CONSULTANTS, INC.; and SAGE CREDIT  )
COMPANY,                            )
                                    )
            Defendants.             )
_____/

              TRANSCRIPT OF MOTION HEARING
           BEFORE THE HONORABLE FRANK D. WHITNEY
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR PLAINTIFF          GARY W JACKSON, ESQ.
                       Jackson & McGee, LLP
                       521 East Boulevard
                       Charlotte, NC 29203


                       TRACY D. REZVANI, ESQ.
                       Finkelstein Thompson LLP
                       1050 30th Street, N.W.
                       Washington, DC 20007


                       CHRISTINE M. FORD, ESQ.
                       Meiselman, Denlea, Packman,
                       Carton & Eberz, PC
                       1311 Mamaroneck Avenue
                       White Plains, NY 10605

APPEARANCES CONTINUED:


FOR DEFENDANTS          MARK S. MELODIA, ESQ.
                        Reed Smith LLP
                        136 Main Street
                        Princeton, NJ 08540


                        ROBERT E. HARRINGTON, ESQ.
                        JONATHAN C. KRISKO, ESQ.
                        Robinson, Bradshaw & Hinson, P.A.
                        101 N. Tryon Street
                        Charlotte, NC 28246


ALSO PRESENT:  SCOTT CAMMARN
                        General Counsel, LendingTree


                        *  *  *


        Proceedings reported and transcript prepared by

                JOY KELLY, RPR, CRR
            U. S. Official Court Reporter
              Charlotte, North Carolina
                   704-350-7495

```
 1                (Call to Order of the Court at 9:00 a.m. )
 2                THE COURT:  Good morning.
 3                We're here in the case of Spinozzi et al v.
 4      LendingTree, LLC, et al. 308, md, for multidistrict, 1976,
 5      on a pretrial motion of the defendant LendingTree to state
 6      its action and compel arbitration.
 7                Let me first thank Dean Stone and the Charlotte
 8      School of Law for allowing us to use this courtroom this
 9      morning.  I understand this is the first time federal court
10      has been held here at the Charlotte School of Law, and I
11      hope it's not the last.
12                On behalf of Chief J. Robert Conrad and the rest
13      of the members of the Western District I hope we can
14      continue to have interesting and educational proceedings
15      here at the law school that will benefit the students and
16      give them a practical understanding of litigation.
17                I also want to thank Inspector Clarence Strahan
18      and the U. S. Marshal Service for providing judicial
19      security.  I think that gives the students a real
20      understanding of what you have to do to enter into a federal
21      or state courthouse since 9/11 and even before.
22                I also want to thank my staff, the deputy clerk of
23      court, Candace Cochran, and the court reporter, Joy Kelly,
24      who had to logistically relocate and set up shop here for
25      this morning's proceeding.
```

1          And I especially want to thank my judicial law

2    clerk, Mr. Baker, over to my left, and my extern and your

3    fellow student, Megan Nicholson, who spent so much time

4    doing the liaison work in setting up this hearing.

5          Now, before we begin, I would like speak to the

6    students for a moment and give you a little background

7    behind the case.

8          We looked for a case that would be educational and

9    that would raise interesting issues of federal

10   jurisprudence.  What appears to you as one case is actually

11   nine different cases that have been consolidated for

12   pretrial proceedings.

13          As you are no doubt are aware, one of the biggest

14   problems faced by the federal court system is the increased

15   congestion of our dockets, which in turn causes justice,

16   both criminal and civil cases, to be delayed.  I've always

17   believed there's a great deal of truth to the old adage

18   justice delayed is justice denied.

19          According to the national averages in 2007 it took

20   a civil case over two years to get from filing to trial.

21   Therefore, there is a manifest need for increased efficiency

22   in the federal court system.  Well, back in 1968 Congress

23   passed, or rather enacted 28 U.S.C., Section 1407, creating

24   the judicial panel of multidistrict litigation.

25          Under Section 1407 the panel has the authority to

1    order the transfer of civil actions involving one or more

2    questions of -- common questions of fact or laws to a single

3    district court.  That court will then conduct pretrial

4    proceedings for all of the cases rather than having them

5    processed piecemeal across the country.  In this way the

6    parties in the course avoid duplicative discovery,

7    conflicting rules, and the overall cost of litigation is

8    reduced.

9            At or near the conclusion of the pretrial

10   proceedings the cases -- assuming cases have not been

11   resolved, the panel will order the cases back to their

12   original districts so the original district judge, the

13   transferor court, tries the case.

14           In the instant case the first plaintiff filed here

15   in the Western District of North Carolina, then moved for

16   pretrial proceedings in all other related cases to be

17   consolidated here.  Defendant LendingTree supported that

18   motion, as did other plaintiffs, but some plaintiffs argued

19   for other locations, such as the Northern District of

20   Illinois and the Southern District of California.

21           The panel found there were common questions of

22   fact and then found that centralization would serve the

23   convenience of the parties and witnesses, and would promote

24   judicial efficiency.

25           The chief judge of the panel called me up in

1    November and wished me a Merry Christmas and gave me the

2    Christmas gift of being the designated judge who would hold

3    the pretrial proceedings for all of these matters.  The

4    panel, therefore, of course, granted the motion and

5    transferred the cases to this district because, one,

6    LendingTree, the primary defendant, is located here and

7    parties, witnesses and documents could be found here.

8           And secondly, this district currently has the

9    docket capacity to handle a consolidated case, which is a

10   little unusual for the history of this district.  Up until

11   just a few years ago our district was backlogged with cases.

12   But because we have actually three new district judges over

13   the last three-and-a-half years, we have been able to catch

14   up, and we're now have less of a docket, less crowded docket

15   than most districts.

16          By way of factual background, I'm sure you're all

17   familiar with LendingTree and its business of assembling

18   consumer credit information and distributing that

19   information to a limited number of third-party lenders.

20          Plaintiff's allege that after providing

21   LendingTree with their personal information, Social Security

22   number, income and employment information, as well as their

23   name, address, e-mail and phone number, LendingTree

24   employees allegedly sold this information to third parties

25   in violation of LendingTree's confidentiality policies, as

1   well as the Federal Fair Credit Reporting Act.  Thus

2   plaintiffs argue they have been exposed to multiple offers

3   of solicitations, credit, identity theft and other damages.

4           Defendant LendingTree contends that this court is

5   the improper forum to address any alleged violations of

6   federal law or other breaches of duty because of a binding

7   arbitration agreement contained and the terms of use that

8   were presented to plaintiffs that plaintiffs ostensibly

9   agreed to when they clicked or checked the box indicating

10  they agreed to those terms.

11          And I'm sure every student, whether in this

12  courtroom or listening to this hearing electronically, has

13  clicked the box on some terms-of-use contract on some

14  website.  So every one of you should understand the factual

15  context of this case.

16          Now because plaintiffs clicked the box,

17  LendingTree argues that this case should be stayed and sent

18  to binding arbitration.

19          Now, I want to add that Congress has indicated its

20  approval of arbitration in the Federal Arbitration Act.  The

21  Supreme Court has consistently upheld this policy favoring

22  arbitration, reversing lower court decisions exhibiting

23  hostility to arbitration clauses.

24          However, the Federal Arbitration Act, in its own

25  terms provides that arbitration agreements, while normally

1  valid and irrevocable, can be voided by state law revocation

2  doctrines.  Plaintiffs argue at least one such doctrine, the

3  doctrine of unconscionability, applies in this case; and the

4  arbitration clause and its provision are unconscionable and,

5  therefore, unenforceable.

6          So today we're here on defendant's LendingTree

7  motion to stay all proceedings and to compel plaintiffs to

8  submit to binding arbitration.

9          Each side will have 30 minutes to argue.

10  Defendants, of course, may reserve some time since they are

11  the movants, and because the defendants are the movants,

12  they should, of course, begin first.

13          And before defendants make their argument, I would

14  ask all counsel to introduce themselves starting with the

15  plaintiffs table.

16          MR. JACKSON:  Good morning, Your Honor.

17          Gary Jackson representing the plaintiffs as

18  liaison counsel and Bercaw, Winsett and Woods.

19          THE COURT:  Thank you, Mr. Jackson.  It's good to

20  see you again.

21          MS. REZVANI:  Good morning, Your Honor.

22          Tracy Rezvani of Finkelstein Thompson.  I'm

23  counsel for Bercaw, Winsett and Woods.  However, I'm

24  authorized to speak on behalf of all the plaintiffs which

25  includes Miller, Bradley, Garcia and Shaver.

```
 1              THE COURT:  Thank you, Ms. Rezvani -- Rezvani,
 2    right?
 3              MS. REZVANI:  Rezvani.
 4              THE COURT:  And I'd ask you, if you could, to move
 5    so you can get close to the mike.
 6              MS. REZVANI:  I will, Your Honor.
 7              MS. FORD:  Good morning, Your Honor.
 8              Christine Ford of Meiselman, Denlea, Packman,
 9    Carton & Eberz.  I'm here on behalf of the Garcia and
10    Bradley plaintiffs.
11              THE COURT:  Thank you, Ms. Ford.  The defendant.
12              MR. HARRINGTON:  Good morning, Your Honor.
13              Rob Harrington of Robinson Bradshaw here in
14    Charlotte.  I'm here with the Jon Krisko from my office, and
15    Scott Cammaran who is general counsel of LendingTree.
16              MR. MELODIA:  Good morning, Your Honor.  Good to
17    see you again.
18              Mark Melodia from Reed Smith.
19              THE COURT:  Yes, Mr. Melodia, it's good to see
20    you.
21              MR. MELODIA:  Also here for LendingTree, LLC.
22              THE COURT:  And you are starting.  Would you like
23    to reserve some time?
24              MR. MELODIA:  I would, Your Honor.  I'd like to
25    actually reserve ten of my 30 minutes, if I could.
```

1      THE COURT:  That's fine.  Mr. Baker, help me on

2  that.  Go ahead.

3      MR. MELODIA:  The argument is pretty straight

4  forward from our point of view, and has a bit of the

5  groundhog day about it.  We're a few days after groundhog

6  day, but the weather reminds us we probably do have six more

7  weeks of winter, and I'm thinking more the movie in which

8  the character kept doing the same thing again and again and

9  expecting a different result.

10      THE COURT:  I understand the implication of your

11  argument, but we have new legal arguments today that were

12  not presented at the original Spinozzi hearing.

13      MR. MELODIA:  There are some new arguments,

14  although they are ultimately unavailing for plaintiffs and

15  shouldn't change this Court's decision.

16      What the plaintiffs here are arguing for is for

17  this court to essentially reverse itself and its ruling of

18  August 21st when Your Honor previously decided, in the

19  Spinozzi, Carson and Mitchell matters, prior to the MDL

20  having been granted, that those plaintiffs would be

21  compelled to individually go to arbitration, consistent with

22  the Terms of Use Agreement that they agreed to and Your

23  Honor found to be valid, irrevocable and enforceable on its

24  terms as provided for under the FAA, and Your Honor also

25  applied the North Carolina Supreme Court decision, now a

```
1    year old, the Tillman case.  That was August.

2              THE COURT:  They now argue, though, that we should

3    be here under California law, and then the Tillman case

4    wouldn't apply.

5              MR. MELODIA:  They do, Your Honor.  That goes to

6    the second point they would ask Your Honor to revisit or

7    reverse, which is the panel you referred to a few minutes,

8    the MDL panel's decision to send this case to North

9    Carolina.

10             The MDL panel did not decide it -- and I'm not

11   suggesting it did -- the enforceability of the venue clause

12   per se.  However, the MDL panel did decide to send this case

13   to North Carolina, and specifically to Your Honor by name as

14   you have suggested, with at least the courtesy of a phone

15   call ahead of time.  And they did that, Your Honor, in

16   October.  They did that knowing that Your Honor had already

17   ruled in August on this very issue, in these very cases,

18   under this same agreement, with the same basic allegations

19   at issue, with class members in presumably the same class.

20             THE COURT:  I agree they had knowledge of this

21   Court's ruling.  But in my discussion with the chief judge

22   there was never any discussion about how I should rule in

23   the future.  It was just awareness that I was abreast of the

24   case, and that I was moving my docket along.

25             MR. MELODIA:  Absolutely.  I don't mean to suggest
```

1    that there was any prejudgment by anybody other than the

2    Court was aware that result had already occurred, and sent

3    the case here, under the MDL rules, which as Your Honor

4    summarized earlier, require a just decision and a efficient

5    decision and a decision that is consistent in pretrial

6    rulings.

7            Obviously, if there are distinctions that matter,

8    then there doesn't need to be a consistent decision.  But

9    one of goals of the MDL process is on its face, and one of

10   the rulings by the panel sending these cases to you, was

11   looking for consistency in pretrial rulings across cases the

12   plaintiffs themselves put forward to the MDL panel and are

13   putting forward to you, Your Honor, as a class, a single

14   class, as consistent cases that involve core common legal

15   issues.

16           What's more common and core and threshold in a

17   case than where it's going to be decided and what law should

18   apply?  That is about as core and common an issue as -- you

19   know, when you're dealing with a class like this -- as you

20   can get.  So --

21           THE COURT:  When you say where it's going to be

22   decided, are you talking about venue or are you talking

23   about choice of law?

24           MR. MELODIA:  Both, Your Honor.

25           THE COURT:  Because they are very different.  I

1   have venue only for pretrial motions.  I don't have venue

2   over the trial.

3            MR. MELODIA:  That's absolutely true.  It will go

4   back, as you said, to the transferor court.  However, when

5   pretrial motions like this one seeking the enforcement of a

6   written contract that you previously found to be enforceable

7   and involving no procedural unconscionability and no

8   substantive unconscionability --

9            THE COURT:  I believe I found there were a couple

10  terms of procedural unconscionability I found for the

11  plaintiffs.  Certainly that there's not an equal bargaining

12  position in that contract.

13           MR. MELODIA:  Absolutely.  Out of the three

14  factors that go under *Tillman* and generally under the

15  unconscionability analysis, we freely admitted in August,

16  and we do again, that obviously there is not equal

17  bargaining power, and this is a contract of adhesion.

18  That's, of course, the beginning of the analysis, not the

19  end of it as Your Honor found correctly in August.

20           So what do we have today?  Sort of faced with two

21  sound and well thought out decisions from, Your Honor, and

22  from the panel --

23           THE COURT:  That's very nice of you to say that.

24  Self-congratulatory.  (Laughter)

25           MR. MELODIA:  When the panel went through its

1  decision-making and it heard argument, by the way at Harvard

2  Law School -- I don't know what it is about this case, I

3  haven't been in moot court in 20 years and I've found myself

4  at two different law schools in this case.

5          THE COURT:  This is a fascinating case.  Rarely

6  does concepts of choice of law and unconscionability becomes

7  so critical and one might argue that it's determinative as

8  to choice of law.  I'm sure that's what you might be

9  thinking, and that's probably what plaintiffs are thinking.

10          MR. MELODIA:  It certainly seems to be what they

11  are thinking.  We believe we can prevail under either set of

12  laws.  They probably will make that same argument.  We both

13  agree the choice of law is critical and there are very

14  interesting issues.

15          At the oral argument at Harvard, which is the

16  first time the MDL panel had ever sat outside of the federal

17  courthouse, and in that argument we heard from these same

18  plaintiffs lawyers the argument that California ought to be

19  where these cases are sent.  California ought to be hearing

20  these issues.  That California was the real locus of

21  activity.

22          THE COURT:  There are defendants out there that,

23  of course, aren't in appearance today.

24          MR. MELODIA:  There are defendants, Your Honor,

25  who have not appeared at all in the past nine months in

1    these cases.

2            THE COURT:  Right.

3            MR. MELODIA:  Who have seemingly not been either

4    served or appeared, I'm not sure which, or both -- but in

5    any case, as you correctly summarized earlier,

6    LendingTree, LLC is the primary defendant.  And most

7    importantly for purposes of the terms of use, the TOU in the

8    arbitration agreement, it's the only defendant that has that

9    agreement.  And it's the only defendant that had the

10   information of the people involved here, the class members.

11   The breach occurred here in Mecklenburg County.

12           THE COURT:  They might argue it occurred wherever

13   the user clicked.  So when you're sitting at your home

14   office, you clicked, and that's the locus of the contract.

15           MR. MELODIA:  Well, even if they made that

16   argument, which they really haven't, Your Honor -- if they

17   made that argument, in fact, of course, the key point here

18   is not a single plaintiff, not one, is from California.  Not

19   one.  So if they make that argument --

20           THE COURT:  That is not past the Court's

21   knowledge.  The Court was aware there were no plaintiffs --

22           MR. MELODIA:  That's not helpful to them either.

23           But faced with these two solid decisions already

24   in this case, the plaintiffs lawyers here have done what I

25   guess every law student by now has figured out you do when

```
 1    you're faced with a question you don't know the answer to
 2    from your law professor, the three Ds:  You distinguish, you
 3    distract, and you delay.  And that's what we have.  We
 4    have --
 5             THE COURT:  Well, they are making another
 6    argument.  They are making an equitable argument that is --
 7    they are the small guy.  And if they are going into binding
 8    arbitration with a class action waiver, then they just can't
 9    financially litigate.  And they have a federal statute that
10    they are trying to enforce.  Congress has certainly given
11    them the legal authority to enforce their rights, but they
12    have -- de facto they lose their statutory rights because
13    it's just economically impossible.
14             MR. MELODIA:  Right.  That is one of distinctions
15    they try to draw from the August argument.
16             THE COURT:  That's true.  Isn't it awfully hard
17    for them to have a financially meaningful day in single
18    arbitration versus class arbitration?
19             MR. MELODIA:  Well, Your Honor, not at all if they
20    have a meritorious claim and if they have damage.
21             So should we encourage, and does the law, and does
22    Supreme Court today encourage any class action to go
23    forward?  Clearly not.  The *Twombly* decision, among a lot of
24    others recently, indicate that's not at all the view of the
25    U. S. Supreme Court.
```

1           THE COURT:  And I think Congress a few years ago,

2    you know, acted to narrow the state jurisdiction over larger

3    class actions also.

4           MR. MELODIA:  That's correct, Your Honor.  Under

5    the Class Action Fairness Act that is what occurred; and, in

6    fact, each one of these cases is brought under the Class

7    Action Fairness Act.

8           So, in fact, while, of course, there's a policy to

9    encourage class actions where they are meritorious and where

10   they can truly do justice, this is not such a situation

11   because, number one, there are no damages.

12          Your Honor mentioned identity theft in the

13   summation earlier.

14          THE COURT:  There's no showing of that.

15          MR. MELODIA:  There's not an allegation of it,

16   Your Honor, forget a showing.  I understand we're at an

17   early stage in this case.  There's no allegation of identity

18   theft.  There's no allegation of unauthorized account

19   access.

20          So if they would have trouble finding a lawyer to

21   take their individual case, perhaps it's because that case

22   doesn't have merit and can't be brought in federal court.

23   That's an argument for another day in terms of the lack of

24   standing and subject matter jurisdiction under 12(b)1.

25          THE COURT:  Let me ask you very quickly, under

1    their statutory remedies of $1,000 per instance, right?

2               MR. MELODIA:  Correct.

3               THE COURT:  How do you define that?  Do you define

4    that as one instance of misappropriation by the employee, or

5    is it every single third party that received that is a

6    single instance; so if ten of them received it, then there

7    would be $10,000 --

8               MR. MELODIA:  There isn't any case law on that

9    issue, Your Honor.  But I think the position that they are

10   taking, and will take, is that every plaintiff has the

11   ability, in terms of their information, to seek statutory

12   damages up to $1,000 under the Fair Credit Reporting Act for

13   an intentional violation, and that's one source of potential

14   damage for them which --

15              THE COURT:  Are you saying then that if it's ten

16   different third parties, it is $10,000?

17              MR. MELODIA:  Per person?  I'm not expressing a

18   view on that.

19              THE COURT:  You're not taking a position on that.

20              MR. MELODIA:  But the point is that there are

21   statutory damages available to them.

22              THE COURT:  Right.

23              MR. MELODIA:  Those in no way waived or changed as

24   a result of the arbitration clause enforcement or the class

25   action waiver.

1          THE COURT:  I understand that.  But if your

2     position -- if your position in court or in arbitration

3     is -- is just -- one misappropriation is just $1,000.

4          MR. MELODIA:  Yeah.  I don't want to get too far

5     distracted with the Fair Credit Reporting Act only, Your

6     Honor, because --

7          THE COURT:  It relates to their argument of

8     unconscionability.  Of course, they haven't overcome choice

9     of law.  If they get to unconscionability, they are going to

10    be arguing that this is financially impossible for them to

11    have a remedy without there being class and without

12    arbitration.  Even if a class action waiver applies to

13    arbitration, they got the class action waiver set aside and

14    they had class arbitration, they'd have at least a better

15    opportunity for a financial remedy, meaningful remedy.

16         MR. MELODIA:  There can't be a class arbitration

17    here.  That's clear from the clause.  And AAA rules also do

18    not allow for class arbitration when there's a clause that

19    specifically says there shouldn't be class arbitration.

20         THE COURT:  Do I interpret that or does the

21    arbitrator do that interpretation?

22         MR. MELODIA:  You, Your Honor.  You, Your Honor,

23    determine whether or not a class waiver is enforceable.

24    That's very clear in the law.

25         THE COURT:  Well, there are even some district

```
 1    courts that take the position I don't even determine the
 2    binding arbitration clause.  That an arbitrator first has to
 3    determine if the binding arbitration clause is binding.
 4            MR. MELODIA:  I think that's the clear minority
 5    and not the correct view.  That's not the Supreme Court's
 6    view and that's not the Fourth Circuit's view.  You, Your
 7    Honor, do determine the enforceable, and you, Your Honor, do
 8    determine the enforceability of the class action waiver.
 9            The Fair Credit Reporting Act is also an issue for
10    another day because it doesn't apply to LendingTree at all.
11    LendingTree is not a credit reporting agency, and we did not
12    furnish under that provision.  But that's a merits argument,
13    I understand, to be defended later.
14            THE COURT:  Well, it is, except it's not under
15    unconscionability.
16            MR. MELODIA:  But Your Honor can't judge the
17    merits of the case, you know, now obviously for either side
18    in order to determine whether or not a clause is
19    unconscionable.  The clause has to be judged as a threshold
20    matter without at view of the merits from the Court which
21    obviously aren't yet before the Court.  Both sides will make
22    their arguments on that.
23            THE COURT:  All right.  Let me direct you back to
24    my threshold issue, that is choice of law.
25            MR. MELODIA:  Okay.
```

1        THE COURT:  There is strong arguing for California

2   law because their contention is that California has a

3   materially greater interest than North Carolina.  And I'd

4   like you to summarize why that's not so.

5        MR. MELODIA:  Certainly.

6        You know, the panel -- of course, the

7   multidistrict litigation panel was faced with those same

8   arguments, chose to send the case here.  You've seen the

9   briefing on that.  Your Honor has briefing in front of you,

10  as well as an affidavit from LendingTree's president which

11  sets forth in detail the ties with North Carolina.

12       You also have a verified complaint from North

13  Carolina, Mecklenburg County, which details how this

14  occurred, who did it, where they did it, and what has

15  happened since, all of which is about North Carolina.

16       None of the plaintiffs is from California.  Not

17  one.  None of the defendants that matter in this case, or

18  who have appeared in this case, were from California.  None

19  of the parties to the arbitration contract and the terms of

20  use are from California.

21       There's no more tie to California than there is to

22  Oregon or Mississippi, and there's actually less tie than

23  there is to Oklahoma.  There are two named plaintiffs from

24  Oklahoma.  In fact, one of the plaintiffs in the Spinozzi

25  case, Mitchell, was from Oklahoma.  And you may remember

1     that that case was transferred to you from Oklahoma.

2             Now, did we decide the issues and argue the issues

3     in August under Oklahoma law?  No.  Why wasn't it raised

4     then?  Why wasn't the argument made that Oklahoma law should

5     have applied in August?

6             Because it was a transferred case here from

7     Oklahoma.  You were the transferee court in that instance.

8     And, in fact, Mitchell was actually from Oklahoma, unlike

9     all the plaintiffs here who are arguing, "oh, you need to

10    apply California law" who aren't from California.  Yes, we

11    have cases being transferred from California and one from

12    Illinois.

13            THE COURT:  Four from California.

14            MR. MELODIA:  You do.  But the reality is that the

15    *Van Dusen* case, which they cite for the principle you must

16    apply -- you have no discretion, you must apply the

17    transferor court's state law.  That would be California in

18    four instances and Illinois in one.

19            That's not at all what *Van Dusen* stands for.

20    Van Dusen stands for, as does all the case law since,

21    including the *Plowman* case -- which we gave to you from the

22    Eastern District of Virginia -- those cases all stand for

23    the proposition that we need to be careful of forum

24    shopping.  We need to be careful of judge shopping.  We need

25    to be careful not to allow people to game the system and to

1    export favorable law to their position and import it into

2    another jurisdiction.   That's what *Van Dusen* was about.

3    *Van Dusen*, as we detailed in the brief, you had no choice of

4    law provision, first of all.   Big distinction.   The second

5    distinction --

6              THE COURT:   That's probably the single-most

7    important distinction.   Right?

8              MR. MELODIA:   It is.   But a close second, Your

9    Honor, is another distinction, which is that venue was

10   proper in the transferor court in *Van Dusen*.   That is the 40

11   people who filed Pennsylvania personal injury actions were

12   Pennsylvania residents who had been damaged in the plane

13   crash.   The fact that those cases then got transferred to

14   Massachusetts for determination under 1404(a), that was okay

15   because --

16             THE COURT:   I understand there's no consumers from

17   California.

18             MR. MELODIA:   Correct.

19             THE COURT:   But some of these missing defendants

20   who are part of this alleged misconduct are residents of

21   California.   So why isn't -- even if they are not here

22   today, why isn't that a proper venue for this proceeding in

23   California?

24             MR. MELODIA:   Well, it isn't a proper venue in

25   terms of -- for any of the named plaintiffs.   None of the

1    activity involving any of the named plaintiffs.

2            THE COURT:  But the case was properly filed -- the

3    four cases were properly filed in the Central District of

4    California.  Right?

5            MR. MELODIA:  They were not because they violate

6    the Terms of Use Agreement, so back to your first point --

7            THE COURT:  Well, are the terms of use -- both has

8    a venue and --

9            MR. MELODIA:  It does.

10           THE COURT:  -- violating the --

11           MR. MELODIA:  Absolutely.  And if you look at the

12   briefing --

13           THE COURT:  Right.  I understand what you're

14   saying.  We've kind of got a circular argument here.

15           You're saying we're in California because we have

16   proper venue because there are some defendants that are

17   there.

18           MR. MELODIA:  Right.

19           THE COURT:  And in California we probably would be

20   able to set aside this choice of venue provision because the

21   contract is unconscionable.  So they have to argue

22   unconscionability first --

23           MR. MELODIA:  Right.

24           THE COURT:  -- to show why you set aside all these

25   arguments, all your arguments of why the contract terms

1  mandate something.

2          MR. MELODIA:  Yeah.  Well, in fact, Your Honor

3  they wouldn't win in California.  And it's interesting, a

4  case you don't have in front of you because it was just

5  decided, *Ramkissoon v. AOL*.  It's a Ninth Circuit case, and

6  it's sort of in the category of be careful what you wish for

7  from the plaintiff's side.

8          In that case -- it's a privacy case, and it was a

9  class action.  And the issue involved whether or not -- you

10  know, whose interests were involved.  And it was a

11  tug-of-war between Virginia and California in that case.

12          In that case the Ninth Circuit was very focused on

13  where are these plaintiffs from, and can the plaintiffs

14  avail themselves of California policies and California

15  statutory rights if they are not from California?

16          It was clear from that decision that the Ninth

17  Circuit would not allow non-California plaintiffs to proceed

18  as if they were covered by the protections of California

19  consumer protection law.  And that's a fundamental problem

20  for them here.

21          THE COURT:  *Ramkissoon*.

22          MR. MELODIA:  *Ramkissoon*, decided January 16th by

23  the Ninth Circuit.

24          THE COURT:  You have used 20 minutes, just to tell

25  you if you'd like to preserve.

1           MR. MELODIA:  I'd like to use a few more to wrap

2    up the basic arguments here, Your Honor.

3           Let's also remember how at least one of the cases

4    got to California.  I mean, they were all a strategic

5    decision to file in California by mostly non-California

6    lawyers; lawyers from New York, DC, Illinois who chose to

7    file in California from people in Pennsylvania, Virginia,

8    Florida, New York.

9           One of the cases in particular highlights their

10   problem, Garcia.  Garcia is from the Bronx.  He has as

11   New York lawyer.  He files in the Southern District of

12   New York.  That's where the case was originally filed.

13          So when we look at *Van Dusen* and where is the case

14   originally filed and that's the transferor court, it was

15   filed in the Southern District of New York.  Then it was

16   voluntarily dismissed and refiled in California, still by

17   the New York lawyer with the New York client, no California

18   client, now adding some California theories that the Ninth

19   Circuit says they can't avail themselves of anyway.  And

20   which the plain language of the statute California

21   residents, California consumers, not Mr. Garcia from the

22   Bronx.

23          They want the advantage of exporting California

24   law which they view as plaintiff-friendly, and we think they

25   wouldn't win under anyway.  But we think that you ought to

1    apply the terms of use just as you did before, and that is

2    North Carolina.

3            The other defendants who are, you know, in those

4    cases haven't shown up.  They haven't even, you know, shown

5    up and defended in, you know, some of cases in California.

6    They sure haven't shown up here.  They are not major

7    players.  They are not parties to this terms of use.  And

8    all they are is people who were seeking to evade the pricing

9    of LendingTree.  They didn't want to pay LendingTree for the

10   leads, so they bought them, you know, from the bad

11   employees.

12           The bad employees were in North Carolina.  The bad

13   employees are under federal investigation in North Carolina.

14   You know, the case that LendingTree brought against the bad

15   employees was in Mecklenburg County in April of last year in

16   North Carolina.  That's the verified complaint you have in

17   front of you.

18           THE COURT:  Right.

19           MR. MELODIA:  The other arguments they try to

20   make, Your Honor, don't get them any further.  They make an

21   argument, as you mentioned earlier, about costs.

22           They do present something they didn't in August,

23   which are some short affidavits from their clients.  What

24   those affidavits tell us is that these people are almost all

25   pretty well employed, have middle incomes, and are pretty

1   well educated and have some interesting jobs, like insurance

2   examiner and a Bank of America account relations person.  I

3   mean, these are not people who are unsophisticated.

4           So all the contract formation issues and issues

5   that we went through in August, which you didn't have too

6   much difficulty finding there was a valid contract, all

7   those arguments are equally valid today.

8           The fact that they say that they can't afford --

9   your point about access to the courts -- and the way that

10  sometimes courts talk about it in terms of a class action

11  waiver is an exculpatory clause; that there shouldn't be

12  exculpation through a class action waiver.  You know, that

13  is pure hypothesis based upon what?  I don't know if they

14  are supposed to be experts or what they are -- the two

15  attorney affidavits from the tens of thousands of lawyers in

16  North Carolina and the millions in the United States who do

17  consumer work, not to mention pro bono and other

18  organizations that do this work.

19          I mean, you know, it's what keeps law firms like

20  mine busy.  There's no absence of individual cases, Your

21  Honor.

22          And just by way of example, with your permission,

23  I'd like to and up a -- you know, a complaint that I

24  happened to have in my briefcase as I was coming down.

25          This is a North Carolina State court complaint.

1  It's a privacy individual case.  It is brought here in North

2  Carolina in state court, and it was filed in December

3  against another one of my clients.  Not this one.  It was

4  brought against Bank of America, Countrywide, for a breach

5  that they had, which is also MDL'd.

6      It also makes no allegations of harm, and it

7  doesn't even make the Fair Credit Reporting Act claim, Your

8  Honor.  And yet here is a lawyer, E. Holt Moore, III, from

9  Wilmington, North Carolina, who has brought this case in

10  court and is pursuing this case against a client of mine.

11  That's just an example.  But it's meant to show what we all

12  know:  Anybody who is in a court every day, everybody who is

13  watching the new fillings knows these cases do get brought

14  on an individual basis.

15      And so the whole access-denied argument really is

16  a red herring.  I mean, does it deny these particular

17  plaintiffs' lawyers of the expectation that they had that

18  they could make a lot of money off of this case?

19  Absolutely.

20      Does it deny their clients of access to both the

21  court's or to arbitration, which Congress has decided is a

22  just and efficient mechanism for determining disputes?

23  Final point there:  The AAA rules.  This is important.

24      Our clause, the terms of use under LendingTree's

25  agreement, specifically incorporates the supplemental

1   consumer rules in arbitration, in AAA arbitration.  The

2   *Tillman* clause, and other clauses that have been struck

3   down, do not have that feature.

4           Tillman specifically said, "Our clause --" the

5   company involved in *Tillman* -- "trumps, supersedes any

6   contrary rule in the arbitrable forum."  Our clause says

7   exactly the opposite.  If it's more consumer friendly in the

8   arbitrable forum, as clearly the AAA rules are which we've

9   given to Your Honor, where the maximum that these people

10  could be out of pocket is $125, that is not a bad forum.

11          THE COURT:  Because the arbiter can allocate the

12  expenses based on size.

13          MR. MELODIA:  Absolutely.  And, in fact, the

14  consumer rules and principles and protocols are very clear

15  as to how that should occur and what principle should be

16  followed, and it is very consumer friendly and it is meant

17  to be.

18          And LendingTree has indicated in August in our

19  briefing, and I'll indicate again today, that we are bound

20  by, and we will follow, those rules and the decisions of the

21  arbiter regarding the way in which costs are going to be

22  incurred.  And we fully recognize that the vast majority of

23  costs associated with those hearings are going to be borne

24  by LendingTree; possibly everything but $125.  None of these

25  plaintiffs have said, "I can't afford $125."  Their lawyers

1  make an argument based upon the commercial rules that do not

2  apply in this case.

3         THE COURT:  Thank you.  You have preserved three

4  minutes.

5         Ms. Rezvani, right?

6         MS. REZVANI:  And I would like to reserve a few

7  minutes to the extent we need to get to the North Carolina

8  and *Tillman* and McCawley (ph), Ms. Ford will be prepared to

9  present those.

10        THE COURT:  All right.  I'll give you a warning

11  like at 25 minutes?

12        MS. REZVANI:  Sure.

13        I think what's important to note here is that the

14  defendants have admitted there is a burden on them, the

15  burden being two-fold:  Whether the contract exists and

16  whether it's enforceable.

17        Now, I'll note that they haven't actually produced

18  the actual contract.  They have produced the sample

19  contract, and they've produced a chart from records that

20  purport to say when our clients had signed this agreement.

21  Now they haven't actually produced the records, but, you

22  know --

23        THE COURT:  You're saying this is not the

24  contract?

25        MS. REZVANI:  That's just a template, a sample, a

1    blank one, but not the one that's actually clicked through

2    by the clients.

3                THE COURT:  Not -- I mean, is there such a

4    database?

5                MS. REZVANI:  Well, according to Mr. Norton there

6    are records.

7                But in any case, even if the motion is denied on

8    that basis, they can simply refile it Monday with the

9    records anew, so I'm not going to rest on that.  But I just

10   want to note they haven't actually met that burden in

11   providing all the records that show that there is, in fact,

12   a contract that governs.

13               The second burden, which is is the contract

14   enforceable?

15               Now, the defendant, LendingTree, argues that the

16   contract is enforceable only if you apply North Carolina law

17   and modify it from the bench.  They never once argue in

18   their papers or here in oral argument that the contract is

19   enforceable if you apply California and Illinois law.  And

20   that's an important thing to note from the very beginning.

21               They rest their entire argument on choice of law

22   and *Tillman*, and so let's get to choice of law.

23               THE COURT:  Well, they rest it on choice of law,

24   choice of venue, binding arbitration, and class action

25   waiver.  That all of those provisions are in there, and that

1   particularly the binding arbitration, it's highlighted in
2   bold face, and it's also capitalized in another provision of
3   the Terms of Use Contract.
4            MS. REZVANI:  Right.  But only if Your Honor --
5   they argue that it's enforceable if Your Honor applies North
6   Carolina law and slightly modifies the contract.  And
7   Ms. Ford is the one who is prepared to really get into that.
8            They are not seeking to enforce the contract as
9   written.  As Mr. Melodia pointed out, they are looking to
10  abide by the consumer rules.  However, the contract abides
11  by the commercial rules.  And that's been held to be
12  substantively unconscionable by California and Illinois
13  courts, and we'll get into why.
14           THE COURT:  Has it been held to be substantively
15  unconscionable under North Carolina?
16           MS. REZVANI:  There has been no ruling on that.
17           MS. FORD:  If I may, just to answer your question,
18  Your Honor, the terms of use paragraph 14 is attached to the
19  Norton Declaration say that the commercial arbitration rule
20  of the AAA will apply.  The *Tillman* court addressed that
21  very argument and found that applying the consumer rules
22  would constitute a rewriting of the contract, which the
23  Court could not do.  In essence, the *Tillman* court rejected
24  the very argument that Mr. Melodia just made with respect to
25  the application of the AAA consumer rules.

```
 1              THE COURT:  So it sounds to me that the argument
 2    you're making is that they have to abide by the commercial
 3    arbitration rules.  But if this Court then holds that choice
 4    of law is North Carolina, you've actually hurt your clients
 5    because they have agreed to waive that --
 6              MS. REZVANI:  They cannot, though.
 7              THE COURT:  All right.  Then you --
 8              MS. REZVANI:  We'll get into in all that when we
 9    argue --
10              THE COURT:  Be careful what you ask for.
11              MS. REZVANI:  Now, the standard the defendant say
12    here is like summary judgment, and that is telling because
13    as Your Honor noted that in many respects, in almost every
14    respect, if a consumer claims -- small claims like these end
15    up going to arbitration, they essentially do not get filed,
16    and I think the *AmEx* court decision from the Second Circuit
17    did a pretty good job in sort of highlighting the debate.
18              THE COURT:  That's an interesting decision.
19              How that does that comply with *Erie v. Tompkins*?
20    Let's just get back to basic constitutional law.  I looked
21    at that decision.  I went, "This is very unique."
22              MS. REZVANI:  Well, *Erie* looks to state law
23    issues, and I think that *American Express* was looking at the
24    Sherman Act specifically.
25              THE COURT:  Well, *Erie* says there's no such thing
```

```
 1    a federal common law.  There's federal general common law
 2    but there's no federal common law.
 3            And as I read that decision, it implies -- well,
 4    there is a federal common law so long as we can craft it.
 5    Because there are two statutes of Congress that might have a
 6    little bit of conflict, we can thereby kind of start
 7    creating own common law.  Am I missing it?
 8            MS. REZVANI:  I'm not sure.  I'm not sure.
 9            THE COURT:  All right.
10            MS. REZVANI:  One of the things that I'd also like
11    to point out is that we can't blanketly apply Spinozzi
12    wholesale.  Because as Your Honor noted, they there are
13    different plaintiffs; that come to you from a different
14    procedural posture, and there's a vastly different record
15    here.
16            The main issue here is what law to be applied.
17    And we heard a lot about the *Van Dusen* and *Van Dusen*
18    exceptions of *Ellis* and *Plowman*.  And I will note that we
19    did not cite *Van Dusen* for the law of 1407, but under the
20    similar 1404 transfer statute.
21            So just to go through the three transfer statutes,
22    1404 essentially codifies forum nonconvenience.  And under
23    1404, you apply the law of the transferor court and 1404 is
24    a permanent transfer.  You would hear the trial.  The Fourth
25    Circuit would hear any appeal.
```

1        The second transfer statute, 1406, essentially

2   looks to see if there's an impairment in prosecuting in the

3   original court, and is there somehow a better jurisdiction.

4   Usually it's a personal jurisdiction issue.  And the

5   *Mitchell* case came to you under 1406, not '04 and not '07.

6   1406, on the other hand, requires the law of the transferee

7   court to apply.  And so Your Honor didn't have a choice to

8   apply Oklahoma law to Mitchell.  You had to apply North

9   Carolina law.

10       And the fear that Mr. Melodia mentioned about

11  forum shopping, perhaps it would apply to a 1404 transfer

12  because you'd file in one court and then try to bring your

13  law with you.

14       And so the *Ellis* and *Plowman* decisions, the

15  *Van Dusen* exceptions, have only been applied to 1404 and

16  1406, transfer decision.  The defendant has not cited any

17  law that gives that exception to 1407.  We've looked.  We

18  cannot find it.  And that's because it wouldn't make sense.

19       Now, 1407, as Your Honor noted, is a JPML

20  transfer, and they don't transfer with any sort of mindset

21  as what choice-of-law analysis the Court has to apply when

22  it gets here.  Their only concern is efficiency and

23  centralization.  Are there enough cases to centralize and

24  where is the best to do it.

25       THE COURT:  They also look at factual issues --

1          MS. REZVANI:  Factual issues as to --

2          THE COURT:  -- such as where one or more of the

3    primary parties are, where the witnesses are, where the

4    documents are.  And all of that also goes to the argument

5    that the defendants are making -- or the defendant,

6    LendingTree, is making -- that, you know, this is really the

7    proper situs or locus of the contract and --

8          MS. REZVANI:  They don't always, and I'll give two

9    examples.

10          The CD price fixing litigation was against record

11    labels.  Record labels are in New York and California.  And

12    the panel sent it to me.

13          The Countrywide suit that Mr. Melodia also

14    mentioned, the connections are Delaware, New York and

15    California.  It ended up in Kentucky.

16          So the panel doesn't always look to the situs.

17    They look to see what clerk of the court can handle another

18    MDL, and what judge, perhaps, is interested in the

19    litigation and can handle it efficiently.  So, yes, it is a

20    factor --

21          THE COURT:  I definitely agree with you that one

22    of the factors is finding a judicial officer with experience

23    in the line of cases and some level of efficiency based on

24    that court's docket.

25          MS. REZVANI:  And the whole notion that just

1    because the case is here, the law of this jurisdiction has

2    to apply doesn't work.  I'm a class action lawyer and,

3    believe me, I live in the MDL.

4          THE COURT:  I don't think they are necessarily

5    making that argument, though, that because the MDL panel

6    sent it here, that North Carolina choice of law -- North

7    Carolina law applies.  I think their argument is there's a

8    contract, and that's why the North Carolina law applies.

9          MS. REZVANI:  The argument is that, well, the

10   panel was aware of the contract, and so they sent it here

11   with the mindset you would apply North Carolina, and perhaps

12   that's a distinction without much of a difference.

13         But I think the reason that the Court should apply

14   the transferor law in a 1407 case is probably -- is common

15   sense.  We come here to you to go through discovery, go

16   through pretrial motions, get our experts vetted, and then

17   once we're mature, we're grown and we're educated we go

18   home.

19         THE COURT:  Okay.  Let me ask you this:  So that

20   means I really not have one case for pretrial proceedings, I

21   have --

22         MS. REZVANI:  Seven or nine cases.

23         THE COURT:  I have an Illinois case, Oklahoma

24   case, a California case and a North Carolina.  I have four

25   different --

1          MS. REZVANI:  No, because Mitchell will not go

2    back.  It's a permanent transfer.  So you have four North

3    Carolina -- you have three North Carolina cases, four

4    California and one Illinois case.

5          THE COURT:  So I have to really be -- I wouldn't

6    have one case, I'd have three cases.

7          MS. REZVANI:  Correct.

8          THE COURT:  And then they very possibly might have

9    different outcomes, and there's the state law --

10          MS. REZVANI:  Believe me they do.  I have had that

11    experience.

12          THE COURT:  Well, I'm presuming the reason you're

13    arguing to strongly for California law is because you think

14    it's more favorable to your client than North Carolina law.

15          MS. REZVANI:  We also want to preserve the system

16    that the JPML and 1407 instills.

17          And I'll give an example.  If we are here and Your

18    Honor has to apply North Carolina law to shape our claims,

19    now North Carolina may have more lenient standards, and so

20    we shape our claims to the more lenient North Carolina

21    standard and then we go back to California or Illinois and

22    appear before a jury there, and now we cannot meet those

23    standards because perhaps those standards are less lenient

24    and more stringent.

25          And so it makes sense that Your Honor would have

1   to -- as the Court says, this is but a transfer of

2   courtrooms -- you have to pretend you are Judge Carny (ph)

3   in LA, and I forget the judge in Illinois -- because you are

4   essentially preparing us to go back home and present our

5   case to a jury in California and Illinois.  And I liken it

6   to prep school or boarding school because we're only here to

7   grow and mature but not to stay.

8          THE COURT:  But the point is that I'm supposed to

9   look at all the different states' choice of law.

10         MS. REZVANI:  Correct.

11         THE COURT:  And follow all the different states'

12  choice of law, at least the three states of Illinois,

13  California and North Carolina, and see which one applies

14  most to this contract or contracts.

15         MS. REZVANI:  Correct.  And one of the things --

16         THE COURT:  But that doesn't mean that I have

17  three different cases going on at once.  I still get back to

18  I look at all three -- I could have three cases, two cases

19  or one case going on at once by looking at all three states'

20  choices of law.

21         MS. REZVANI:  Well, the first question is under

22  1407 you have to see which law is applied.  And that's

23  substantive and choice of law.  So the first part of our

24  argument is that under 1407 Your Honor must apply the choice

25  of law of statutes of California and Illinois to the cases

1    that have been transferred to you under 1407.

2              THE COURT:  All right.  So why does the California

3    choice of law tell me I have to apply California substantive

4    law?

5              MS. REZVANI:  I will get to that.

6              THE COURT:  Isn't that really key?

7              MS. REZVANI:  It is.  And one of the things --

8              THE COURT:  Because if California actually tells

9    me to use North Carolina law, then I'm back here in North

10   Carolina.

11             MS. REZVANI:  Right.  Yeah.

12             One of the things that I wanted to address briefly

13   is this concept of venue.  And I think we've established

14   that this venue exception, this *Van Dusen* except -- first of

15   all was for personal jurisdiction, and Countrywide can't --

16   LendingTree can't allege that we would not have had personal

17   jurisdiction over them in California.  And so the question

18   Your Honor was asking --

19             THE COURT:  Well, LendingTree does business in

20   California.

21             MS. REZVANI:  They claim to have one of their

22   headquarters in Irvine, California, and we have that in the

23   record from their website that represents to the world that

24   we have a headquarters in Irvine.

25             The Irvine location is three times as large with

1  three times the employees.  And based on anecdotal stories

2  from consumers, when they called in response to this letter,

3  they were told they were talking to someone in California.

4          Additionally, the defendants that LendingTree

5  claims were improperly joined for forum shopping are the

6  same defendants they, themselves, sued in Orange County.

7          Now, we have that also in the record.  And if Your

8  Honor looks at paragraph 17 of LendingTree's complaint, they

9  claim that venue in that jurisdiction is appropriate,

10  because a) they are a California entity, and b) most of the

11  wrongful conduct occurred here.  And that is something that

12  they claim to support venue for themselves in California.

13          And so the goose and gander fits good enough for

14  LendingTree for venue to be appropriate in California, why

15  isn't it good enough for the consumers who are actually

16  harmed by the wrongful conduct that they are suing under?

17  So I wanted to briefly touch on the concept of venue.

18          But now to get into choice of law, *Nedlloyd* is the

19  main case in California and it sets up a test.  And the

20  first question is:  Is the chosen state in the contract?  Is

21  there a reasonable basis for it, a reasonable relationship?

22  And I think yes --

23          THE COURT:  No.  No substantial relationship.

24          MS. REZVANI:  Substantial relationship or

25  reasonable basis, I think is it test.

```
1              THE COURT:  Well, I thought it was a Restatement
2     (Second) of Conflicts that says that you apply the
3     choice-of-law provision if it's in the contract, unless
4     either the chosen state has no substantial relationship,  no
5     substantial --
6              MS. REZVANI:  No.  The Nedlloyd case, it pretty
7     clearly says that it's either -- the question is does the
8     chosen state have a substantial relationship or does it have
9     a reasonable basis.  If the answer is yes --
10             THE COURT:  We must be reading a different
11    restatement.  Because I -- you use the chosen state unless
12    the chosen state has no substantial relationship to the
13    parties or the transaction, and there's no other reasonable
14    basis.
15             MS. REZVANI:  Well, they might have modified --
16             THE COURT:  -- saying no substantial relationship.
17             MR. MELODIA:  Section (1)(A)(7).
18             THE COURT:  Section (1)(A)(7)(2).
19             MS. REZVANI:  Here's the actual language from the
20    statute.  "Whether the chosen state has a substantial
21    relationship to the parties or their transaction, or where
22    there is any reasonable basis for the parties' choice of
23    law.  If either test is met, the Court must next determine
24    whether the chosen state's law is contrary to fundamental
25    policy of California."
```

```
 1              THE COURT:  And that's the Restatement (Second)
 2    of --
 3              MS. REZVANI:  I'm reading from *Nedlloyd*.  And they
 4    may have slightly modified it for California.  But I'm
 5    reading directly from the decision.  It's 3 Cal.4th 459.
 6    I'm at page 465 and 466.
 7              So the question then -- and we agree that there's
 8    a reasonable basis for North Carolina; there is a
 9    relationship here.  So the question now is:  Does this North
10    Carolina law, is it contrary to a fundamental policy of
11    California?
12              Now, we've cited numerous cases that in California
13    there's a fundamental policy in favor of class action,
14    especially in consumer cases, and especially when you are
15    dealing with smaller claims.  And so that's why California
16    has almost universally knocked down class waivers in
17    arbitration clauses.
18              I think -- the only time I think I have seen it
19    that it has not been struck down in a commercial -- two
20    commercial parties.  But when it's a consumer versus a
21    commercial entity, they are struck down.
22              So that is the fundamental public policy that
23    would be violated if California law is not applied.  And I
24    would only point to Spinozzi as evidence that this
25    particular clause could be upheld here under North Carolina
```

1    law.

2            THE COURT:  My concern is -- I thought I knew

3    which restatement we were dealing with.  But the one that

4    I'm reading came right from the Ninth Circuit in a 2008

5    decision, and it's a very different test; dramatically

6    different test.  The chosen state has no substantial

7    relationship.

8            MS. REZVANI:  Yes.  I'm reading from a California

9    Supreme Court opinion.

10           THE COURT:  And I believe -- it's always wonderful

11   to have an externally bright law clerk -- he handed me a

12   note saying that is a paraphrasing from that opinion, and

13   it's not a direct cite of the -- a direct quote of the

14   Restatement (Second) of Conflicts of law.

15           MS. REZVANI:  I will also note that the defendant

16   does not contest that a fundamental public policy of

17   California would be contravened if North Carolina law is

18   applied.  The only thing that they contest is whether

19   California has a materially greater interest than North

20   Carolina.

21           *Discover Bank* and *Oestricher*, which we cite in

22   your briefs, spell out the fact that some are case-specific

23   and some are of general state interest.

24           For the case-specific ones, there are some that

25   are neutral.  The place of contracting.  And as Your Honor

1  noted that it's where someone is clicking on their computer.

2          THE COURT:  I knew that would be your position.

3          MS. REZVANI:  Right.  And so that's a --

4          THE COURT:  And their position I think is it's

5  where the server is.  I'm not telling you what's my

6  position.  I haven't decided yet.

7          MS. REZVANI:  Well, I think under California law,

8  I think perhaps under an lex loci analysis, it would

9  possibly be where the server is.  But I think under

10  California law it is where the person resides.  And this is

11  in the 50 states.  It's a neutral factor.

12          Place of negotiation is another neutral factor.

13  There was no negotiation.  They've admitted it's an adhesion

14  contract.  You've admitted --

15          THE COURT:  It's clearly an adhesion contract.

16          MS. REZVANI:  And a place of performance.  Well

17  the performance is I give you information.  You get me leads

18  and people call me.  Well, they call me at home, so again

19  that's a neutral factor.

20          Another case-specific factor from those decisions

21  is location of the subject matter of the contract.  The

22  subject matter of the contract again is information.  Where

23  is the information?  Well, it's in California in the hands

24  of these other defendants.  And so that is a factor that

25  favors in California and not North Carolina.

1          The domicile of the parties.  Well, that also

2    favors California given what we discussed about the contacts

3    with California when I briefly discussed venue, and we go

4    into it in our briefs as well.

5          Another factor where is of the place of wrong.

6    Well, the defendants who stole the data are in California.

7    But information is still hopefully maintained in California.

8    But as we learned in *Certegy*, even when these quote/unquote

9    legitimate businesses buy information, they are potentially

10   likely to sell it to less desirable elements of our society,

11   shall we say, for purposes -- for nefarious purposes.

12         THE COURT:  I think that's one thing that

13   LendingTree will agree.  Because the other defendants should

14   have been paying LendingTree openly for this information,

15   and they view it as information stolen from them also.

16         MS. REZVANI:  And LendingTree also admits that

17   most of the wrongful conduct at issue did occur in

18   California in the complaint that they filed against these

19   defendants.  So place of wrong also favors California.

20         Then there's the generally state interest.

21   California has an interest in deterring wrongful conduct by

22   its businesses.

23         THE COURT:  Well, does any state not have that

24   interest?

25         MS. REZVANI:  Exactly.

1          THE COURT:  All 50 states want to deter wrongful

2    conduct by businessmen or business women.

3          MS. REZVANI:  And all five of these businesses are

4    headquartered and have a principal place of business in

5    California.  All five are not here in North Carolina.

6          THE COURT:  Well, I have an interesting question

7    on that.  Are they purely in default or are they actually

8    served?

9          MS. REZVANI:  They were not in default.  Actually

10   I wrote that down --

11         THE COURT:  If they are in default, how come there

12   hasn't been a motion for default against them?  Because --

13         MS. REZVANI:  Because they are not in default.

14         LendingTree was served June 19th.  Home Loan was

15   served June 18th; they answered 31.

16         THE COURT:  Home Loan is an affiliated party.

17         MS. REZVANI:  No.  There's a Home Loan Consulting.

18         THE COURT:  Oh, I'm sorry.

19         MS. REZVANI:  They answered in California, July

20   31st.  Sage was served June 18th; they answered on July

21   15th.  Their counsel withdraw at the end of September.  The

22   Court gave them about 30 days to find new counsel.  And then

23   the cases were transferred here.  And so that's the --

24   procedurally we're sort of in the middle right there.

25         Chapman's agent refused service of process.  We're

1   still trying to get them served with the Secretary of State.

2          Southern California Marketing was served July 1st.

3   They did not answer the complaint but they did file a

4   response at the MDL, so now that we're here, we're going to

5   have to follow up with them.

6          Newport Lending Corp was served.  However, the

7   proper defendant was Newport Lending Group, Inc.  So we're

8   going to have to amend that complaint and at the end of this

9   hearing we'll address some housekeeping matters to try to

10  fix that.

11         So we're not sitting idly by.  They have been

12  served, those have been answered.  They've entered

13  appearance in one shape or another and so there are some

14  things we have to do to clean up the record, but we're

15  perfectly fine.

16         As far as the state's interest in deterring

17  conduct, Mr. Melodia seemed to imply that *Ramkissoon*, which

18  I think is actually *Doe v. AOL*, held that the consumer

19  statues only applied to consumer residence.  It does not

20  hold that.  No California court would ever say that a

21  business incorporated or doing business within its confines

22  of the state lines can defraud people so long as the people

23  are outside of their states.  The California statutes apply

24  to California businesses.  California also has an

25  interest -- this is in *Discover Bank* -- has an interest in

1    protecting against superior bargaining power, and conversely

2    protecting those with inferior bargaining power.  And

3    California also has an interest in adjudicating claims

4    brought under its own statutes.

5             THE COURT:  All of those seem to be a concern of

6    every state sovereign.

7             MS. REZVANI:  But, again, it's because we have the

8    five California defendant and not one North Carolina.  I

9    think it's just --  and I hate to play the numbers game,

10   but --

11            THE COURT:  Well, that's very legitimate.  But we

12   do have, as LendingTree points out, we have the one

13   defendant that has an arbitration clause in a contract.

14   There are no contracts with any other defendants because

15   they are committing a tort.

16            MS. REZVANI:  Well, and also they couldn't borrow

17   LendingTree's argument.

18            THE COURT:  Right.  I mean they can't -- their

19   torturous conduct, and there's no contract there --

20            MS. REZVANI:  So arguably those are neutral

21   factors.

22            THE COURT:  Right.

23            MS. REZVANI:  But I think that adjudicating those

24   statutory claims brought under California law, I think

25   that's definitely in the state interest.  We brought a 17200

```
1   claim --
2           THE COURT:  But I noticed California, when it has
3   California plaintiffs and California statutory law prefers,
4   of course, choice of law for California.  That makes sense.
5   But basically the California claims you're raising now are
6   not unique to California.  They are -- every state has --
7           MS. REZVANI:  17200 is unique in that it has some
8   unique remedies that is not available in other
9   jurisdictions.  And 1790.80 is pretty unique to California.
10          I know Mr. Melodia says that it's limited to
11  California residents.  However, in *Ruiz v. Gap*, it was
12  upheld.  It was my own client.  He was Texas resident.  And
13  in subpart 85, you can apply that out of state.
14          THE COURT:  But don't North Carolina and Illinois
15  have the same concern; that they would prefer to have their
16  statutory remedies adjudicated under, you know, Illinois
17  North Carolina law?
18          MS. REZVANI:  We don't bring a North Carolina UDAP
19  statute claim, though.
20          THE COURT:  No.  But I mean that's all part and
21  parcel of this.
22          MS. REZVANI:  No.  Because, Your Honor, again, you
23  would have to adjudicate the claims we bring because these
24  are the claims we have to present to the jury when we go
25  back home.  So we can't rewrite the statute and say well
```

```
 1    we're going to apply the North Carolina UDAP, and then go
 2    back home -- and this is the situation I explained; that
 3    there might be different standards between North Carolina
 4    and California law.   If we tee up --
 5            THE COURT:  Substantively I don't think anyone is
 6    disputing that.  It's the question of getting back to is
 7    California choice of law, you know, mandate that California
 8    law apply to the -- whatever number of plaintiffs in this
 9    case.
10            MS. REZVANI:  Yes.  Yes.
11            THE COURT:  That's your argument.
12            MS. REZVANI:  I think the cases prove that out.
13    Because based on these factors that I outlined, California
14    does have a materially greater interest in governing the
15    claims brought under the California statutes by these
16    plaintiffs in the California court given the factors that I
17    outlined case-specific and general.
18            THE COURT:  You said "these plaintiffs."  But
19    where do those plaintiffs live?
20            MS. REZVANI:  They do not live in California, but
21    none of the ones that filed in North Carolina are from North
22    Carolina either, so...
23            THE COURT:  Well,  no, but they filed here because
24    LendingTree is down the street.
25            MS. REZVANI:  Well, they also filed where
```

```
 1    LendingTree is in California.  And that's the thing, is that
 2    we need to come to terms with the fact that LendingTree
 3    holds itself out to the world as having two corporate
 4    headquarters:  Charlotte and Irvine.  So our original filing
 5    in California is entirely proper, jurisdiction is
 6    appropriate, venue is appropriate, and California would
 7    never halt one second in applying its law to these claims in
 8    California.  And since you have to pretend you're Judge
 9    Carny (ph),  and that's the point of the analysis under
10    1407.
11              THE COURT:  All right.  You have used 25 minutes.
12    You can continue --
13              MS. REZVANI:  I need to continue because I haven't
14    touched on Illinois and I don't want to --
15              MS. FORD:  Your Honor, can we have some time to
16    address the Tillman factor?
17              THE COURT:  You have 30 minutes, however you want
18    to use it.
19              MS. REZVANI:  I'll be very quick.
20              In Illinois, the Wigginton decision, it's a
21    slightly laxer decision because it's a two-part test, which
22    is:  Is there a reasonable basis for the chosen state?  Yes.
23    And does it contravene public policy in Illinois?  And like
24    California, the public policy concern is class actions being
25    able to vindicate small claims and the rights of the
```

1   consumers, and *Kinkel* and *Direct TV* are the cases that

2   outline that.

3              So we do have a record -- in the record case law

4   and arguments that does support the application of Illinois

5   law under the Illinois choice-of-law analysis.

6              Now, as I mentioned at the very outset,

7   LendingTree only contests that its clause is enforceable if

8   North Carolina law is applied and Spinozzi is applied

9   wholesale.  And so if Your Honor holds, as I believe the law

10  requires this Court to hold, that the choice-of-law analysis

11  requires the application of California and Illinois law,

12  we're done because they've never contested that their clause

13  is enforceable under California and Illinois law.  And so

14  for that I will give my five minutes to Ms. Ford.

15             THE COURT:  You have three minutes.

16             MS. FORD:  Your Honor, I'd like to just address if

17  the Court does apply North Carolina law, this is a very

18  different case than Spinozzi.  It's not -- as LendingTree's

19  concedes in its brief, Spinozzi is not the law of the case

20  as the plaintiffs that are before you on this motion.  And

21  the Garcia and Bradley plaintiffs join in all the arguments

22  that Ms. Razvani made with respect to the application of the

23  California law.

24             However, I would just like to emphasize that the

25  *Tillman* court applied a sliding scale of unconscionability.

1    And so as Your Honor mentioned earlier, you previously found

2    there were elements of procedural unconscionability that

3    were here, particularly with respect to the unequal

4    bargaining power.

5           I'd like to also just touch upon one of the other

6    elements of procedural unconscionability, and that's lack of

7    meaningful choice.  And LendingTree acknowledges in their

8    brief that the plaintiffs had to click "accept."

9           THE COURT:  That's -- what they argue in their

10   brief -- of course you have got to click, but they could

11   have gone on Google and looked for other loan packages.  And

12   they have a lot of competitors.  They would love for those

13   competitors to go away, I think, but their argument is there

14   are competitors out there.

15          MS. FORD:  Right.  Which Your Honor gets to the

16   point of marketplace alternatives.  And there have been

17   courts, you know, in particular the *Shroyer* case out of

18   California, that say the lack -- that marketplace

19   alternatives shouldn't matter.  But I just wanted to point

20   out that as established by Mr. Bennett's affidavit, which is

21   Exhibit 14 to the Bercaw plaintiff's briefs, we established

22   that there was no marketplace alternative because the

23   competitors all have arbitration clauses as well.  So there

24   was no --

25          THE COURT:  Well, but that's -- if enough

1    consumers said, "We don't want to --" you know, they

2    e-mailed to all these different websites and said, "You have

3    an arbitration clause.  We're not going to bid with you --"

4    then I mean, isn't that -- that's why we have a marketplace,

5    isn't it?

6              MS. FORD:  But, Your Honor, that gets to the fact

7    that there's no bargaining power.  And these are all people

8    of modest means who, you know, are hardworking.  The

9    marketplace being the Internet loan community --

10             THE COURT:  It's a little paternalistic.  You're

11   saying that some very sophisticated individuals -- even if

12   they're not extremely well educated, they are competent

13   individuals, weren't competent enough to make selection.

14             MS. FORD:  But there's no choice.  There's no

15   choice, Your Honor, because they all have the bargaining --

16   they don't have the bargaining power and all the competitors

17   have the same clause, so there is no marketplace

18   alternative.

19             And if I just could use some time to touch on the

20   substantive unconscionability elements that are here.

21             THE COURT:  You have thirty-five seconds.

22             MS. FORD:  One thing -- with respect to the

23   arbitration cost being prohibitively high, you have evidence

24   in the record of financial means of the plaintiffs.  Their

25   average monthly income is about $3,000 a month.  They are

1    supporting children.

2           With respect to the application of the consumer

3    rules for the AAA, paragraph 14 of the terms of use

4    specifically states that the commercial arbitration rules of

5    the AAA would apply.  This is very important.

6           The *Tillman* court expressly addressed this

7    argument.  It's at 655 SE2d 372.  The defendants made the

8    same argument, and the Court said, I have to look -- the

9    *Tillman* court said we have to look at the contract as

10   written, and it's inappropriate to rewrite an illegal or

11   unconscionable contract.

12          LendingTree's argument is based on the premise

13   that the AAA would not enforce this contract as written;

14   that rather than applying the commercial rules as stated in

15   the terms of use, they would apply the consumer rules.

16   That's not the contract that's before the Court.  It's a

17   different contract.

18          Now, in addition in *Tillman* the defendants offered

19   to pay the cost of the arbitration, just as LendingTree has

20   offered to do here.  And what LendingTree -- they haven't

21   really offered to pay the cost.  What they said is they

22   intend to file a practical suggestion to front costs.  It's

23   a meaningless promise.

24          THE COURT:  Well, you know, if your clients were

25   to prevail in punitive damages, I certainly think they would

1    not want to be paying the cost.

2           MS. FORD:  But, Your Honor, that gets back to the

3    terms of contract as written.  Because the contract as

4    written states that the arbitrator is limited to only apply

5    actual compensatory damages and that penalties are waived.

6           THE COURT:  Unconscionability is an equitable

7    concept.  And when you say that *Tillman* bars a tweaking of a

8    contract to achieve equity, then it kind of turns *Tillman* on

9    its side, in my opinion.  It says you can't have equity when

10   you are using an equitable principle.

11          Like I said before, you have to be careful what

12   you ask for.  Because if you're mandating commercial

13   arbitration rules, you are hurting your client.

14          MS. FORD:  But, Your Honor, what the Court should

15   do to protect the consumers is to look at the contract as

16   written, which is what *Tillman* says that you need to do; you

17   can't blue pencil it.  And then what companies should do is

18   rewrite their arbitration clauses to include the consumer

19   rule.  That's a different contract, and that's a contract

20   that's not before this court.

21          If I could make a few points --

22          THE COURT:  You're two minutes over, so I was

23   generous.

24          Thank you.  Thank you very much, Ms. Ford.

25          MR. MELODIA:  Your Honor, I'm going to start at

1  the end.  I'm going to start at the end.

2          On the AAA point.  In the Exhibits G, H, I and J

3  to our reply it is very clear as pages 16 and 21 of the

4  Commercial Arbitration Rules and Mediation that, "The AAA

5  applies the supplementary procedures for consumer-related

6  disputes to arbitration clauses and agreements between

7  individual consumers and businesses where the business has a

8  standard systematic application of arbitration clauses."

9  And then it goes on.

10          In those rules, which are specifically

11  incorporated in the commercial rules, Your Honor, there is

12  where we find all of the rules that LendingTree has said,

13  both in court, in its brief, and most importantly in its

14  contract, the TOU, which specifically incorporates any

15  future changes to the AAA rules, which includes in 2003 and

16  2005 these consumers protections.  That's critical.

17          The reason *Tillman* in this argument makes no sense

18  at all is, yes, the *Tillman* court did say to those defendants

19  you can't rewrite your contract because your contract,

20  defendant in *Tillman*, said that the rules -- that the terms

21  of use, the agreement in *Tillman*, governs and supersedes.  As

22  I started with earlier, that's the exact opposite of our

23  contract.  So it is the plaintiffs who are rewriting their

24  contract.

25          THE COURT:  I understand.  I've -- you've only got

1    30 seconds left, and I want to get this question answered.

2              One of Ms. Rezvani's strongest arguments is that

3    you, in your pleadings in California, say this happened in

4    California.

5              MR. MELODIA:  We did not say it happened in

6    California.  We said that the bad lenders who stole our

7    information and tried to get around our system operated

8    badly and committed a tort in California.  That's not this

9    case.

10             THE COURT:  Your employees were aware when they

11   improperly took this information -- assuming they improperly

12   took this information -- where were they located?

13             MR. MELODIA:  North Carolina, Your Honor, and the

14   suit against them, which is a verified complaint in front of

15   Your Honor as an exhibit, is in North Carolina.  Everything

16   about every employee, including, by the way, the people who

17   took the phone calls in response to the letters, were in

18   North Carolina.  At most there was a backup system in

19   Phoenix.  There was nothing in California.  Our affidavit on

20   that point, Exhibit D to our reply, is very clear.

21             THE COURT:  So the issue becomes:  Does North

22   Carolina have a greater material interest in enforcing and

23   using North Carolina law when wrongful conduct occurs in

24   North Carolina, or does California have a materially greater

25   interest when wrongful conduct occurred in North Carolina?

```
 1          MR. MELODIA:  Correct.

 2          THE COURT:  Or both places, because it was shipped

 3   out there.  But it initially started here and then went out

 4   there.

 5          MR. MELODIA:  Absolutely.  The breach occurred

 6   here.  Your Honor, a couple --

 7          THE COURT:  No.  No, you're out of time.

 8          MR. MELODIA:  No, I have three minutes.  Your

 9   Honor --

10          THE COURT:  All right.  I gave them two extra

11   minutes.  I'll give you one.

12          MR. MELODIA:  Thank you.

13          MS. FORD:  A few seconds?

14          THE COURT:  All right, I'll do this:  I'll give

15   you two minutes and give you an extra 30 seconds.  I'll

16   watch it.

17          MR. MELODIA:  Deal or no deal.  Deal, Your Honor.

18   (Laughter)

19          Your Honor, in the no-alternative argument, let me

20   give you this.  These are just this morning, as you'll see

21   from the 6:14 a.m. line on the e-mail --

22          THE COURT:  I was up at that time too.

23          MR. MELODIA:  -- here are three competitors, Your

24   Honor, with websites which have no arbitration clause and no

25   class action waiver in the same business as LendingTree.
```

1    That's a specious argument.

2          Additionally, *AmEx*, the Second Circuit case that

3    was presented to you, is extraordinarily unique.  It will be

4    interesting to see if it's reconsidered en banc, but it is

5    clearly limited --

6          THE COURT:  It's been out four days -- no, six

7    days.

8          MR. MELODIA:  -- to an antitrust context.  And it

9    does talk about a federal substantive law.  It has no

10   bearing certainly on the *Tillman* analysis.

11         LendingTree does contest that there is -- that we

12   would lose in California.  And we specifically contest that

13   there is no --

14         THE COURT:  But you admit your case would be

15   tougher in California --

16         MR. MELODIA:  It would be tougher in California.

17         THE COURT:  -- because contracts of adhesion are

18   not enforceable.

19         MR. MELODIA:  But it would not be tougher against

20   these plaintiffs.  The plaintiffs you have in front of you,

21   it would not be tougher at all because California would not

22   protect them in this case.  I think that is clear.

23         The final point is who has the burden.  Tracy

24   started with the point that we have the burden.  We don't

25   have the burden.

1    THE COURT:  Well, this is your motion.  You do
2    have the burden here.
3    MR. MELODIA:  We do not have the burden.  The
4    burden is always on -- under the FAA and/or the Supreme
5    Court case law, the burden is always on the person
6    contesting the enforceability of the arbitration clause.
7    Similarly, under Ninth Circuit authority, including the
8    *Ramkissoon* decision recently in the Ninth Circuit, it's
9    clear, and under Supreme Court case law, the *Bremen* case
10   from 1972, is the plaintiffs, who have a heavy burden to
11   establish a ground upon which the clause is unenforceable.
12   THE COURT:  I agree with you they are contesting
13   it, your agreement. Thank you very much.
14   Ms. Ford.
15   MS. FORD:  Your Honor, just a few very quick
16   points.
17   Mr. Melodia handed up documents that just
18   evidences that there's a need for discovery.  Page 14 of the
19   Garcia-Bradley plaintiffs brief; pages 34, 35 of the other
20   plaintiffs' brief cites numerous cases allowing for
21   discovery.
22   THE COURT:  Well, that really goes to choice of
23   law, doesn't it?
24   MS. FORD:  No, Your Honor, that --
25   THE COURT:  California allows it and North

1    Carolina really doesn't.

2              MS. FORD:  In *Tillman* there were depositions.  In

3    *Tillman* there was discovery.

4              THE COURT:  Well, *Tillman* was litigation.

5              MS. FORD:  In *Kucan*  the North Carolina appellate

6    court remanded to examine the facts which have the

7    opportunity for discovery.  I point Your Honor to the

8    *Terminix* case, a recent decision out of Arkansas, where the

9    court issued a motion for reconsideration because it said it

10   was error to not allow discovery.

11             So just the fact that documents are being handed

12   up, it just shows that we should have the opportunity to

13   fully flush out things through discovery.

14             THE COURT:  Well, I mean, you have both made your

15   arguments.  You have said that all the competitors have

16   binding arbitration clauses.  They said otherwise.  The

17   Court will weigh that in its analysis as to whether there's

18   a need for discovery or not.  We hear both side's arguments

19   on that.

20             All right.  It's now 10:17.  We'll recess for 15

21   minutes, and we will come back and I will either give you an

22   answer or not give you an answer.  The great thing about

23   being a judge is I get to tell you when I'm going to tell

24   you the answer.  All right.  So we will be in recess.

25             (Recess taken.)

1            THE COURT:  Excuse me while I get organized here.

2            After reviewing the pleadings, evidence and case

3     law submitted by both parties, and after hearing oral

4     argument, the Court is prepared to issue its oral order on

5     defendant LendingTree's motion to stay and compel

6     arbitration.

7            I want to add for the students that some of the

8     things the Court will orally rule on today you probably did

9     not hear in argument, but all of this has been well briefed

10    by the parties.

11           The ultimate issue before the Court is whether the

12    arbitration clause in the terms of use is an enforceable

13    agreement to arbitrate, valid and irrevocable under the

14    Federal Arbitration Act, or unconscionable under state law

15    principles, and, therefore, unenforceable.  The threshold

16    question then is which state's law the Court must apply to

17    determine the issue of unconscionability.  In addition to

18    the arbitration clause, the terms of use contain a

19    choice-of-law clause that reads, quote, "This agreement

20    shall be subject to and construed in accordance with the

21    laws of the state of North Carolina."  Close quote.

22           LendingTree argues that this choice-of-law clause

23    is determinative of the conflicts issue and that North

24    Carolina applies.  Plaintiffs, however, argue that the

25    applicable conflicts principles mandate the application of

1  California and Illinois law.

2        It is a general rule of multidistrict litigation

3  that, quote, "when considering questions of state law the

4  transferee court must apply the state law that would have

5  applied to the individual cases had they not been

6  transferred for consolidation."  And I cite a decision,

7  which I might have a hard time reading the name but I'll do

8  the best I can -- *In re: Temporomandibular Joint (TMJ)*

9  *Implants Products Liability Litigation*, that's

10  T-E-M-P-O-R-O-M-A-N-D-I-B-U-L-A-R,  97 F.3d 1050.  Pinpoint

11  cite 1055, Eighth Circuit 1996.  This rule applies to

12  choice-of-law rules because these rules are part of a

13  state's substantive law.  Both California and Illinois take

14  the same approach to choice of law, that found in

15  Restatement (Second) of Conflicts, Section 187 (2).

16        Under that test the law chosen by the parties will

17  be applied unless either (1) the chosen state has no

18  substantial relationship with the parties and there's no

19  other reasonable basis for the parties' choice; or (2)

20  application of the chosen law would be contrary to a

21  fundamental policy of a state which has a materially greater

22  interest than the chosen law, and whose state's law would

23  have applied but for the choice-of-law clause.

24        As to the first element, North Carolina clearly

25  has a substantial relationship with the agreement and the

1   events surrounding the alleged misappropriation of

2   information because the employees improperly acted within

3   North Carolina.

4           Plaintiffs, however, argue that the application

5   under the North Carolina law would lead to the application

6   of a particular provision of the arbitration clause, a class

7   action waiver.  Plaintiffs contend that the class action

8   waiver in the agreement is unconscionable under California

9   law; that California has a fundamental policy against

10  unconscionable class action waivers, and that California has

11  a materially greater interest in this litigation than North

12  Carolina.  This Court disagrees.

13          First:  The Court is of the opinion that the class

14  action waiver is not unconscionable under California law.

15  The California Supreme Court has made it clear that not all

16  class action waivers are unconscionable.  See *Discover Bank*

17  *v. Superior Court*, 113 E.3d 1100, pinpoint cite 1108-10

18  California 2005.

19          The three-part test for unconscionable class

20  action waiver is (1) whether the agreement is a consumer

21  contract of adhesion drafted by the party that has as a

22  superior bargaining power or powers.  (2) whether the

23  agreement occurs in a setting in which disputes between the

24  contracting parties predictably involve small amounts of

25  damages; and (3) whether it is alleged that the party with

1    the superior bargaining power has carried out a scheme to

2    deliberately cheat large numbers of consumers out of

3    individually small sums of money.

4          The first element is unquestionably met as

5    LendingTree had superior bargaining power and would not have

6    negotiated terms with the plaintiffs.

7          The second element, however, is not met.

8    Plaintiffs argue that the damages in the instant case are

9    small, mostly involving statutory damages under the Fair

10   Credit Reporting Act.  This argument ignores the word

11   "predictably."  To argue that damages were predictably small

12   because they are, in fact, small is the classic fallacy of

13   affirming the consequent.  The paradigmatic setting of

14   predictably small damages is a credit card agreement that

15   provides for late fees.  Once again I cite *Discover Bank*,

16   113 P.3d 1103.

17         The agreement to arbitrate this case did not occur

18   in such a narrow setting.  The agreement itself is broadly

19   stated to cover, quote, "any claim or controversy arising

20   out of or relating to the use of this website to the goods

21   or services provided by LendingTree, or to any acts or

22   omission for which you may contend LendingTree is liable."

23   Close quote.

24         The setting could have therefore have included a

25   full range of claims, including contract claims such as

breach of express or implied warranty, various tort claims
such as negligence, fraud, and unfair and deceptive trade
practices, as well as federal consumer protection statutes,
such as the Fair Credit Reporting Act.

Even assuming a setting as narrow as the Fair
Credit Reporting Act, the fact that the Act explicitly
allows for punitive damages would seem to negate the element
of predictably small damages. That's found at 15 United
States Code, Section 1681n (a) (1) (B). The second element
is therefore not met.

Similarly, plaintiffs' allegations fall short of
satisfying the third element. While it is true that under
California law a summary allegation of a deliberate scheme
to cheat consumers is sufficient, plaintiffs' allegations
include no such scheme. Instead, plaintiffs' complaints all
include allegations that LendingTree deliberately or
recklessly failed to maintain the appropriate safeguards for
plaintiffs' information. This allegation, even when viewed
in the light most favorable to plaintiffs, does not equate
to a deliberate scheme to cheat consumers out of
individually small sums of money.

The failure to maintain adequate safeguards and
engaging in a deliberate scheme to cheat consumers are
entirely different allegations. Plaintiff's have alleged
the former, not the latter. Thus the third element not

1  satisfied.

2          Because plaintiffs can satisfy neither the second

3  element, that damages were predictably small, nor the third

4  element, that LendingTree carried out a scheme to

5  deliberately cheat consumers out of small sums of money,

6  plaintiffs have failed to establish that a class action

7  waiver is unconscionable under California law.

8          Even if the class action waiver were

9  unconscionable and did violate a fundamental policy of

10 California, it is abundantly clear to this Court that

11 California's interest in this litigation is not materially

12 greater than North Carolina's.

13         California courts consider several factors to

14 determine which state's interest is greater, including the

15 domicile of the parties, place of contract formation, the

16 place where the wrong occurred, and whether the applicable

17 law is California statutory law.  This Court cites *Klussman*

18 *v. Cross Country Bank*, 134 Cal.App. 4th 1283, pinpoint cite

19 1299 .  2005.

20         Most significantly, none of the plaintiffs are

21 California residents.  Plaintiffs have joined various

22 California corporations as defendants, but none of these

23 defendants have appeared, and plaintiffs have not initiated

24 default proceedings against those -- that there are some

25 proceedings continuing in those actions.

1          It is clear that LendingTree is the key defendant,

2    and LendingTree is based in North Carolina.  The last stage

3    of contract formation was plaintiffs clicking and checking

4    of the box indicating consent to the terms of use.  This

5    presumably took place at plaintiffs' residences which are in

6    Florida, Georgia, Nevada, New York, Oklahoma, Pennsylvania,

7    Utah and Virginia, but not California.

8          The parties dispute the place of the wrong, which

9    was either California, where the confidential information

10   was allegedly sold, or North Carolina where LendingTree

11   allegedly failed to maintain adequate safeguards.

12         Plaintiffs have alleged violations of certain

13   California statutes, but it is clear from the complaints

14   that an alleged violation of the Fair Credit Reporting Act

15   is the predominant claim.  Plaintiffs argue that all the

16   factors showed that North Carolina has, quote, "no greater

17   interest than California," close quote.  This is a

18   misstatement of the test.  Plaintiffs must show that

19   California has a materially greater interest than North

20   Carolina in order to override the choice-of-law clause.

21   They have not done so.

22         Accordingly, under the Restatement, Section

23   187(2) test, the Court must enforce the parties' choice of

24   North Carolina law.  This analysis applies even more so to

25   Illinois, a state with even less of a relationship to this

1  case.

2      Turning now from the choice-of-law analysis to the

3  substantive law of unconscionability, North Carolina law

4  requires findings of both procedural and substantive

5  unconscionability.

6      Prior to the multidistrict panel's consolidation

7  in this case, the Court heard oral argument regarding the

8  Spinozzi plaintiffs and held that the agreement to arbitrate

9  was not unconscionable under North Carolina law.  The

10 plaintiffs now argue that this holding was in error,

11 rehearsing many of the points already addressed and disposed

12 of by the Court in its prior order.

13     The plaintiffs novel argument supported by

14 affidavit is that several of the plaintiffs lack the

15 economic means to arbitrate and that this prohibitive

16 expense makes the agreement to arbitrate substantively

17 unconscionable.

18     Leaving aside the merits of this argument, which

19 the Court considers far from conclusive, the plaintiffs are

20 still unable to make a showing of procedural

21 unconscionability.  Unlike California, the contract of

22 adhesion is not prima facie procedurally unconscionable

23 under North Carolina law.  Notably, this case is completely

24 lacking in the other indicia of procedural unconscionability

25 discussed by the North Carolina Supreme Court in *Tillman v.*

1 *Commercial Credit Loans*, *Inc*. 655 S.E.2d 362, North Carolina

2 2008.

3          There was no unfair surprise.  Plaintiffs had all

4 the time they needed to read and understand the terms of

5 use.  Similarly, there was no lack of meaningful choice.

6 Plaintiffs had any number of other options for obtaining

7 mortgage loan services, including other loan comparison

8 services on the Internet.

9          Thus, the Court holds, as it did in the Spinozzi

10 cases, that the agreement to arbitrate is not

11 unconscionable.  The agreement is therefore valid,

12 irrevocable, and enforceable under the Federal Arbitration

13 Act.

14          The plaintiffs have recently called the Court's

15 attention to the Second Circuit's holding in *In re:*

16 *American Express Merchants' Litigation*, No. 06-1871-CV, 2009

17 West Law 214525, Second Circuit, January 30th, 2009.

18          In that case the Second Circuit stated that it

19 would, quote, "evaluate arbitration clauses containing class

20 action waivers under the federal substantive law of

21 arbitrability."  Close quote, *id*. at slip opinion page 9,

22 rather than under a state -- rather than under a state law

23 revocation doctrine such as unconscionability.  In so doing,

24 the Court held that the class action waiver with which it

25 was presented was unenforceable because if enforced the

waiver would grant the defendant, American-Express, de facto
immunity from federal antitrust laws.

Crucial to the court's holding was an affidavit
filed by an economics expert detailing, quote, "the
complexity and analytical intensity of an antitrust study."
*Id*. at slip opinion page 13.

The expert concluded that, quote, "even a
relatively large -- small economic antitrust study would
cost at least several hundred thousand dollars, while a
larger study could easily exceed $1 million," *id*.

The Court declines to apply the reasoning of *In
re: American Express* to invalidate the arbitration and
class action waiver clauses for two key reasons.

First, and most simply, *In re: American Express*
is not binding on this Court. As the transferee court for
actions originating in the Ninth, Tenth, Seventh and Fourth
Circuits, this Court is not bound by Second Circuit
decisions. None of the applicable circuits have applied the
theory espoused by the Second Circuit in *In re: American
Express*.

Second, even should the Court find *In re:
American Express* persuasive, the facts of that case are
markedly different than those of this case. The court there
went to great pains discussing complexity and expense of an
antitrust action. It is that extreme expense that led the

1    Court to conclude that a class action is the only way to

2    ensure liability for antitrust violations.  An action

3    brought under the Fair Credit Reporting Act is simply not

4    comparable in either legal or factual intensity.  Thus,

5    enforcement of the arbitration clause and class action

6    waiver in this case does not amount to a de facto grant of

7    immunity.

8            Finally, the Court does not believe that

9    additional discovery is appropriate.  Congress's reasons for

10   codifying a national policy favoring arbitration to ease the

11   burdens and expense of traditional litigation for parties

12   and the courts would be thwarted by allowing every case with

13   an arbitration clause to be derailed by unconscionability

14   discovery.  The Court cites *Southland Corp. v. Keating*, 465

15   U.S. 1; *Galt v. Libbey-Owens-Ford Glass Company*, 376 F.2d

16   711, pinpoint cite page 714, Seventh Circuit, 1967.

17           Accordingly, defendant LendingTree's motion to

18   stay and compel arbitration is granted.

19           I believe plaintiffs had some other issues they

20   wanted to raise.

21           MS. REZVANI:  Yes, Your Honor.  With respect to

22   the remaining defendants, I know Your Honor just read in

23   your order they hadn't entered an appearance, and they

24   haven't.  But as I had mentioned in oral argument, they had,

25   in fact, entered appearances by answering.  And so those

1     cases still remain live.

2            So I would like to -- and I know we're not in your

3     normal courtroom, but we probably should set up some kind of

4     a status conference.  We could get MDL moving with respect

5     to the remaining defendants because we do need to start

6     setting some schedules, deadlines and that.  And I would

7     like to reach out to defense counsel for those other

8     defendants in order to make that suggestion.  But I wanted

9     to raise that with you as to scheduling.

10           THE COURT:  Is there any third-party defendant who

11    has not filed an answer?

12           MS. REZVANI:  Let me look at my notes.

13           THE COURT:  Because if they are in default, I

14    would strongly suggest you seek entry of default from the

15    clerk and then move for a default judgment.

16           MS. REZVANI:  Southern California Marketing is the

17    one that is in default, so that was the only one we could

18    have a --

19           THE COURT:  All right.  So we can  --

20           MS. REZVANI:  We mentioned Sage's answered, but

21    they are looking for new counsel.  And Newport Lending,

22    we're going to have to amend the complaint to name the right

23    entity and serve that entity.

24           THE COURT:  All right.  Well, as to those in

25    default, then I would procedurally ensure they are in

1    default before they come in and file something in the last

2    minute -- well, they are outside their time, but they can

3    argue excusable neglect under the Federal Rules of Civil

4    Procedure.  And as to having to amend your complaint -- have

5    they filed a motion to dismiss?

6              MS. REZVANI:  They have not.

7              THE COURT:  Just from your reading of their

8    answer, you know that --

9              MS. REZVANI:  Well, Newport Lending Corp has not

10   answered.  In conversations with their counsel, we have

11   noted that they were the wrong entity.  And I think

12   LendingTree made the same mistake when they sued them in

13   California.  So I believe they will have to amend their

14   complaint as well in California to name the right entity,

15   and then we can start from scratch.

16             THE COURT:  Let's just shore up who is in this

17   case.  And as soon as we have a joinder of the issues of the

18   third-party defendants -- and we'll overcome any Rule 12

19   motions, of course, and this Court does not delay discovery

20   for 12(b)(6) motion.  We delay discovery on most of the

21   other motions where you're dealing with jurisdictional

22   hurdles, but 12(b)(6) are basically a step towards summary

23   judgment.  So if there's a 12(b)(6) motion filed by one of

24   the third-party defendants, we would still be directing them

25   into discovery.

```
 1              MS. REZVANI:  Okay.
 2              THE COURT:  So just shore up the case as to the
 3    third-party defendants.  And then once we know who the
 4    parties are, then we can set a discovery schedule.  What I
 5    suggest is you call Mr. Baker directly on that and we will
 6    facilitate the conference call for an initial attorneys
 7    conference.
 8              MS. REZVANI:  Okay.  Thank you.
 9              THE COURT:  Anything else?
10              MS. REZVANI:  That was my only housekeeping
11    matter.
12              THE COURT:  Let me come down and thank all the
13    counsel.
14              THE CLERK:  One more matter we need to attend to
15    before.
16              MS. NICHOLSON:  Judge Whitney, we just have a gift
17    for you.
18              THE COURT:  Is this bribery?
19              MS. NICHOLSON:  Thank you for coming to hold this
20    at the law school.  We appreciate, your initiative on
21    getting it taken care of.  And we also obviously want to
22    thank all of the attorneys for allowing us to host your
23    motions, and we hope that you'll come back and see us.
24              THE COURT:  This is great.  Thank you.  Thank you
25    all.  Thank you very much.
```

```
 1              (Court adjourned at 11:00.)

 2                        -  -  -  -

 3


 4
      UNITED STATES DISTRICT COURT
 5    WESTERN DISTRICT OF NORTH CAROLINA

 6


 7


 8                  CERTIFICATE OF REPORTER

 9         I, JOY KELLY, RPR, CRR, certify that the foregoing

10    is a correct transcript from the record of proceedings in

11    the above-entitled matter.

12


13


14

15    S/JOY KELLY

16    JOY KELLY, RPR, CRR                      Date _____
      U.S. Official Court Reporter
17    Charlotte, North Carolina

18

19

20

21

22

23

24

25
```